# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| CHAUNCEY J. TOUNSEL, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 2644 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| CAROLYN W. COLVIN, Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Chauncey J. Tounsel Sr., seeks judicial review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. § 432(d)(2). Mr. Tounsel asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

## PROCEDURAL HISTORY

Mr. Tounsel applied for DIB on February 4, 2009, alleging a disability onset date of December 1, 2006, due to peripheral neuropathy and organic mental disorders (chronic brain syndrome). (Administrative Record ("R.") 56). His application was initially denied on July 24, 2009 and upon reconsideration on February 5, 2010. (R. 74, 83). Mr. Tounsel filed a timely written request for rehearing on March 18, 2010, and a hearing was held on December 1, 2010. (R. 11). Mr. Tounsel appeared and testified at the hearing. (R. 14-20, 34-37). Ellen Rozenfeld, an impartial psychological expert, and Lee Knuston, an impartial vocational expert, also testified. (R. 20-29, 29-

32). In addition, Regina Shifman, Mr. Tounsel's best friend, also testified at the hearing. (R. 37-46). The Administrative Law Judge ("ALJ") was presented with the issue of whether the claimant, Mr. Tounsel, is disabled under the Social Security Act. However, if the claimant is under a disability and there is medical evidence of a substance use disorder, there is an additional issue of whether the substance use disorder is a contributing factor material to the determination of disability. (R. 61). Essentially, the issue for the ALJ was whether, were the applicant not a substance abuser, would he still be disabled. *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006). On February 9, 2011, the ALJ issued an unfavorable decision concluding that Mr. Tounsel is under a disability, but that a substance use disorder is a contributing factor material to the determination of disability. (R. 58, 61). The ALJ concluded that, if Mr. Tounsel stopped his substance abuse, although he would still be limited in his capacity to interact with others, he would nevertheless be able to perform his past work as an electrical engineering manager, supervising people most of the day. (R. 68-69). The ALJ's decision became final on May 8, 2012, when the Appeals Counsel denied Mr. Tounsel's request for review. (R. 1). Mr. Tounsel appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.

### THE EVIDENCE OF RECORD

#### A.

#### The Vocational Evidence

Mr. Tounsel was born on August 16, 1966, making him 44 years old at the time of the ALJ's decision. (R. 185). He completed a four year college degree in engineering and attempted to go to business school. (R. 16). Mr. Tounsel is divorced and has three children whom he sees every

weekend and throughout the summer. (R. 18). From 1993 to June of 1998, Mr. Tounsel worked at Omni Circuits as an engineer designing circuit boards for cell phones. (R. 16, 125). He was later promoted to engineering manager, and he was in charge of the engineering department where he supervised a number of people almost all day. (R. 16, 129). From June of 1998 to December of 2004, he was the manager of the IT department at Allstate and, again, supervised people nearly all day. (R. 125, 130).

## B.

## The Medical Evidence

On January 5, 2009, Mr. Tounsel visited the emergency room complaining of foot tingling and swelling. (R. 250). He admitted to drinking a pint of vodka a day. (R. 250). He was diagnosed with bilateral foot tingling, alcohol abuse, and hypomagnesia. (R. 253). He also had a CT scan of the head which demonstrated an acute intracranial hemorrhage as well a brain atrophy "more than expected" for someone his age. (R. 258). Discussing this evidence at the hearing, the ALJ noted that brain atrophy is irreversible; he stated that "once the damage is done, it's done." (R. 48). The ALJ explained that once a person reaches a certain pathology in their cognitive function, significant improvement is unlikely. (R. 48).

On February 2, 2009, Mr. Tounsel was referred for psychiatric evaluation due to depression, numbness in both feet, and insomnia. (R. 266). Dr. Carreira diagnosed Mr. Tounsel with peripheral neuropathy, probably caused by alcoholism. (R. 267). Dr. Carreira prescribed Cymbalta and Mirtazapine, and he saw Mr. Tounsel for three more follow up visits in the next month. (R. 267).[1]

---

[1] Cymbalta is used to treat major depressive disorder, general anxiety disorder, and fibromyalgia. http://www.drugs.com/cymbalta.html. Mirtazapine is used to treat major depressive disorder. http://www.drugs.com/mirtazapine.html.

3

On June 3, 2009, Mr. Tounsel was brought to the ER for psychiatric evaluation after Regina Shifman called EMS when Mr. Tounsel threatened suicide. (R. 278). He made threats like these for two weeks prior. (R. 278). The doctor noted that Mr. Tounsel had questionable compliance with bipolar medication, and that he had been drinking. (R. 278). The doctor remarked that Mr. Tounsel was "alert, awake, and in no distress", but that he sometimes laughed inappropriately and got angry. (R. 278). The ultimate diagnosis was acute alcohol intoxication and bipolar disorder—manic depression. (R. 282).

On July 2, 2009, Mr. Tounsel went in for an examination with Dr. Kale for the purpose of providing information to the Bureau of Disability Determination Services. (R. 293). As per Mr. Tounsel's explanation, Dr. Kale noted that when Mr. Tounsel was in a manic state, he would binge drink and become abusive. (R. 294). Dr. Kale remarked that Mr. Tounsel was able to perform activities of daily living including dressing, bathing, toileting, shopping, cooking and cleaning. (R. 294). As far as his muscoskeletal abilities, Dr. Kale mentioned that Mr. Tounsel was able to get off the examination table without difficulty, but that he could not stand from a chair without using hands for assistance. (R. 295). Dr. Kale also remarked that heal to toe stand was not possible due to poor balance; gait was markedly antalgic with a broad based gait near falling; and that Mr. Tounsel needed his girlfriend to help him walk. (R. 295). In regards to the mental status examination, Dr. Kale noted that Mr. Tounsel was able to correctly provide his name, age, and general personal information. (R. 301). His remote memory was adequate, but his immediate memory was impaired. (R. 301).

On April 26, 2010, Mr. Tounsel visited Dr. Chris Dion who completed a peripheral neuropathy residual functional capacity questionnaire. Dr. Dion posited that the prognosis for peripheral neuropathy was permanent. (R. 443). The severity of pain and paresthesia was

4

"moderate" and signs of impairments included muscle weakness, impaired sleep, sensory changes, and motor loss. (R. 443). Dr. Dion remarked that Mr. Tounsel exhibited significant limitations of motion in ankles and wrists, and that he would only walk half a block without rest or severe pain. (R. 444). Dr. Dion noted that Mr. Tounsel could stand and walk for less than two hours in a workday, and that he must use a cane for walking and standing. (R. 444).

On May 3, 2010, Mr. Tounsel again met with Dr. Carreira. (R. 439). In terms of work-related activities, Dr. Carreira found that Mr. Tounsel lacked the mental abilities and aptitude needed to do unskilled work. (R. 441). Dr. Carreira noted that Mr. Tounsel had "marked" restrictions in activities of daily living and "marked" difficulties in maintaining social functioning. (R. 442). Dr. Carreira remarked that Mr. Tounsel had "constant" deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner. (R. 443). In terms of mental abilities and aptitude needed to do unskilled work, Dr. Carreira found that Mr. Tounsel had "poor" or no ability to maintain attention for a two hour segment; poor or no ability to maintain regular attendance and be punctual; poor or no ability to work in coordination with or proximity to others without being unduly distracted; poor or no ability to complete a normal workday and work week without interruptions from psychologically based symptoms; poor or no ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and poor or no ability to accept instructions and respond appropriately to criticism from supervisors. (R. 441). Dr. Carreira found that if Mr. Tounsel was placed in a competitive job, he would be unable to perform or be exposed to: public contact; routine, repetitive tasks at a consistent pace; detailed or complicated tasks; strict deadlines; closer interaction with coworkers/supervisors; fast paced tasks; and exposure to work hazards. (R. 444).

5

## C.

## The Administrative Hearing Testimony

### 1.

### The Plaintiff's Testimony

Mr. Tounsel testified that he binge drinks when he has an episode of his bipolar disorder. (R. 14). He drinks when he is depressed or anxious but does not normally drink all the time. (R. 14-15). Mr. Tounsel does not realize when he is having an episode, and he subsequently does not remember what he does during these episodes. (R. 33). He uses alcohol during these times because it calms him down. (R. 15). Mr. Tounsel testified that before ever seeing a doctor, he thought "something was wrong with [his] mind." (R. 17). He had always been a hard worker, went to college, supported his family and suddenly the "the floor fell right from under [him]." (R. 17).

Mr. Tounsel testified that he is estranged from his family "because I'm constantly at some boiling point." (R. 17). On one occasion he kicked his children out of the house because his son accidentally broke a window with a basketball. (R. 33).

Mr. Tounsel worked at Omni Circuits where he designed circuit boards for cell phones, and he was in charge of the engineering department. (R. 16). Afterwards, he worked as a manger in the IT department at Allstate. (R. 16). At both positions Mr. Tounsel had a number of people reporting directly to him. (R. 16). Mr. Tounsel noticed several issues while working at Allstate—he experienced confusion, loss of concentration, and he was often called in by management for going off on tangents about irrelevant matters. (R. 32-33). He was always getting into disagreements with coworkers, started missing deadlines on projects, and was moved around a lot because of behavioral problems. (R. 16). Mr. Tounsel's friend pointed out that he "was not the same person." (R. 33). Mr.

Tounsel testified that he did not drink while working at Allstate and was not reprimanded at work for alcohol use. (R. 32).

Mr. Tounsel also testified that he attended Keller School of Management to get his MBA but "couldn't concentrate or focus on finishing my MBA, which I really wanted to do." (R. 16).

Mr. Tounsel excused himself during the testimony to vomit because of anxiety and nervousness. (R. 36) He testified that this happens four or five times a week. (R. 36). Mr. Tounsel testified that he would sometimes not leave the house for days at a time because of nervousness, which triggers vomiting and diarrhea. (R. 36).

**2.**

**The Medical Expert's Testimony**

Ellen Rozenfeld testified as the psychological expert. Based on the medical evidence, Dr. Rozenfeld opined that with the use of alcohol, Mr. Tounsel would have a moderate limitation in terms of ability to engage in daily living. (R. 24). She posited that, while abusing alcohol, Mr. Tounsel would have marked limitation in social functioning given the lack of impulse control and history of violence. (R. 24). She also opined he had marked limitation in terms of concentration, persistence, and pace.

Dr. Rozenfeld made different findings assuming Mr. Tounsel ceased his use of alcohol. She felt he would have a moderate limitation in ability to engage in daily living. (R. 25). In terms of social functioning, she posited mild to moderate limitations. (R. 27). Lastly, she found his concentration, persistence, and pace would suffer mild limitations if he refrained from using alcohol. (R. 27).

Dr. Rozenfeld also found that alcohol exacerbates the "secondary mental health issues." (R. 26). She opined that the personality disorder with the aggressive actions and intermittent explosiveness is substance induced. (R. 27).

### 3.

### The Vocational Expert's Testimony

Lee Knuston testified as the vocational expert. Mr. Knuston testified that both of Mr. Tounsel's jobs—at Omni and at Allstate—were sedentary and very skilled jobs. At both of these positions, Mr. Knuston said he "would think" the frequency of interactions with coworkers, supervisors, and the general public "would be occasional", amounting to about a third of the day – but he would "have to double check that" in the Dictionary of Occupational Titles ("DOT"). (R. 30). He also said that Mr. Tounsel described his job just as the DOT describes it (R. 30), although Mr. Tounsel said he was dealing with people most of the day.

### 4.

### Regina Shifman's Testimony

Regina Shifman, Mr. Tounsel's friend of ten years, testified at the hearing. Both Mrs. Shifman and Mr. Tounsel worked at Allstate—Mrs. Shifman worked for Mr. Tounsel. (R. 38). Mrs. Shifman testified that she frequents Mr. Tounsel's home about four times a week and does general house-keeping duties such as cooking, cleaning, and making sure that bills are paid on time. (R. 39).

In terms of Mr. Tounsel's drinking, Mrs. Shifman testified that she becomes intimidated by how he behaves as he becomes very confrontational and can become very angry and enraged. (R. 40-41). She remarked that there is no real physical abuse unless she tries to calm him down and then "he can get aggressive fast." (R. 41).

Mrs. Shifman testified that during their time at Allstate, Mr. Tounsel would become rude if anyone contradicted his authority. She mentioned that Mr. Tounsel was demoted because other employees started to complain that he was rude and easily agitated. (R. 44). Mrs. Shifman also noted that she never saw Mr. Tounsel use alcohol while on the job, and that she never saw him come to work under the influence. (R. 41).

## D.

### The ALJ's Decision

The ALJ found that Mr. Tounsel suffered from the following severe impairments: bipolar personality and alcohol addiction disorder with alcohol induced peripheral neuropathy. (R. 64). The ALJ next determined that Mr. Tounsel's impairments, including the substance abuse disorder, which met section 12.04 of CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)). (R. 64). The ALJ went on to determine that if Mr. Tounsel stopped the substance abuse, the remaining limitations would have more than a minimal impact on his ability to perform basic work functions, and therefore, Mr. Tounsel would continue to have a severe impairment or combination of impairments. However, the ALJ found that if Mr. Tounsel stopped the substance use, he would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ relied on the psychological expert's testimony to find that Mr. Tounsel would not have limitations amounting to two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation. (R. 65). As such, the "paragraph B" criteria would not be satisfied if the substance use was stopped. (R. 65).

The ALJ then determined that if Mr. Tounsel stopped the substance abuse, he would have the residual functional capacity to perform light work but that he would be limited to only occasional – up to one third of the day – contact with his co-workers, supervisors, and the general public. (R.

65). The ALJ noted that while Mr. Tounsel's medically determinable impairments could reasonably be expected to produce the alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible. (R. 65-66). The ALJ rejected the opinions of Mr. Tounsel's treating doctors because they "provided little evidence of objective medical evidence" and "appear[ed] based upon subjective complaints provided by the claimant." Next, the ALJ relied on the VE's testimony and determined that if Mr. Tounsel stopped the substance use, he would be able to perform past relevant work as an electrical engineering manager. Accordingly, the ALJ found Mr. Tounsel not disabled and not entitled to DIB under the Act. (R. 69).

## IV.

## DISCUSSION

### A.

### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one in which the court plays an "extremely limited" role. *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008)(*citing Richardson v. Perales,* 402 U.S. 389, 401 (1971)). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue,* 580 F.3d 471, 475 (7th Cir. 2009); *Berger,* 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue,* 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must

reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir. 2007). While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger,* 516 F.3d at 544; *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of her findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue,* 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996). It has also called this requirement a "lax" one, but the ALJ must still rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger,* 516 F.3d at 544–45.

### B.

### The Five Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue,* 573 F.3d 503, 512–13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351–52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe,* 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein,* 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe,* 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

### C.

### Analysis

### 1.

The ALJ focused on determining whether Mr. Tounsel had a substance abuse disorder that was a contributing factor material to the determination of disability. In so doing, the ALJ found that, even if Mr. Tounsel ceased his alcohol abuse, he would still be limited to no more than occasional contact with co-workers, supervisors, and the general public. From there, the ALJ determined that, even with such a restriction, Mr. Tounsel could perform his past work as an electrical engineering manager, even though the Seventh Circuit has noted that, "[p]erhaps someone with poor social skills should not have even superficial contact with workers." *Walters v. Astrue*, 444 F. App'x 913, 918 (7th Cir. 2011).

In reaching the conclusion that Mr. Tounsel could return to his managerial work , the ALJ relied on the VE who testified that the frequency of interaction by an electrical engineering manager with coworkers, supervisors, and the general public would be no more than occasional, which is up to a third of the day. (R. 30). The VE referred to the DOT in his testimony, citing DOT 003.167-070

for electrical engineering manager, and said "looking at the interaction, I *think* it would be occasional." (R.30)(emphasis supplied). That conclusion is speculative. The DOT provides a more involved definition for an electrical engineering manager in terms of interaction. According to the DOT, an electrical engineering manager:

> *Directs* and coordinates activities of engineering department to design, manufacture, and test electronic components, products, and systems: *Directs* department activities, through subordinates, to design new products, modify existing designs, improve production techniques, and develop test procedures. Analyzes technology trends, human resource needs, and market demand to plan projects. *Confers* with management, production, and marketing staff to determine engineering feasibility, cost effectiveness, and customer demand for new and existing products. Forecasts operating costs of department and directs preparation of budget requests. *Directs* personnel activities of department, such as recruitment, hiring, performance evaluations, and salary adjustments. *May direct* field testing of products and systems performed by field staff.

http://www.occupationalinfo.org/00/003167070.html (emphasis supplied). This description suggests that an electrical engineering manager's interaction with coworkers, supervisors, and the general public would be anything but occasional. By directing and coordinating activities of the engineering department; conferring with management, production, and marketing staff; and directing personnel activities of the department, an electrical engineering manager would spend a large proportion of their day interacting with coworkers. The DOT description shows that an electrical engineering manager's day would be focused around interacting with others.

Delving deeper into the DOT's description, we find that aptitudes required for the position underscore the need to be able to interact with others without limitation. Coordinating actions of others and speaking to others are two of the most important skills. Listening to others and oral expression are two of the most important abilities. http://occupationalinfo. org/onet /13017a.html. Perhaps most significantly, the DOT lists the important work activities as guiding, directing, and motivating others; consulting and advising others; and coordinating the work of others.

13

http://occupationalinfo.org/onet/13017a.html. Again, this paints a picture of anything but occasional interaction with others.

When there exists a conflict between the vocational expert testimony and the DOT, the burden of making the necessary inquiry is on the ALJ. *Prochaska v. Barnhart*, 454 F.3s 731, 735 (7th Cir. 2006). The ALJ failed to do so. The ALJ relied solely on the VE's speculation and unexplained conclusion and did not make the necessary inquiry into the difference between the DOT and the VE's testimony. If VE evidence and the DOT conflict, the ALJ must obtain a "reasonable explanation" for the apparent conflict. *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008). To say that an individual restricted to only occasional contact with others can *manage* a department is the type of conflict the ALJ should have picked up on on his own. *See Overman v. Astrue*, 546 F.3d 456, 463-64 (7th Cir. 2008).

But Mr. Tounsel's attorney focused on the problem, and brought up the interaction issue when he questioned the VE. During this exchange, the VE was not so certain as to the frequency of interaction an electrical engineering manager would have with coworkers, supervisors, and the general public and that it would be only occasional. When questioned by Mr. Tounsel's attorney about whether a manager in a position of managing employees would have occasional interaction with coworkers, the VE seemed to fumble. The VE testified that:

> "I would say most key occasions would be occasional because people are working. That's up to a third of the day, so you can do a lot of supervision, communications, and still be occasional. *But at a highly skilled job such as that, you have to be able to deal with people . . . beyond giving and receiving simple instructions. [You have to] sit down and relay some concepts."* (R. 52)(emphasis supplied).

The VE testified that both of Mr. Tounsel's previous jobs were very skilled jobs, with a specific vocational preparation (SVP) of 9. (R. 29). Therefore, at such highly skilled jobs, the manager has

more than superficial contact with coworkers and supervisors—he "[has] to be able to deal with people." (R. 52). This certainly undermines the VE's initial testimony that he "would think" interaction would be no more than occasional and undermines the ALJ's conclusion.

The VE was right about one thing, though. As it turns out, although he was a little equivocal about the number of people reporting directly to him, Mr. Tounsel's description of his supervisory responsibilities at both Omni Circuits and at Allstate was consistent with the DOT. He spent a great deal of time in a supervisory capacity on a daily basis. (R. 16, 125, 129-130). So whether one goes by the DOT or Mr. Tounsel's description, Mr. Tounsel is limited to no more than occasional interaction with others, cannot perform his past work managing an electrical engineering department. *Cf. Getch v. Astrue*, 539 F.3d 473, 482 (7th Cir. 2008)(question is whether claimant can return to his past work as he performed it or as it is generally performed in the economy). This case must be remanded to the Commissioner for further proceedings.

**2.**

A couple of additional points are worth mentioning. An ALJ's decision must be based on the testimony and the medical evidence. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). ALJs may not play doctor and substitute their judgment for that of a medical professional by coming to medical conclusions not supported by the record. *Rohan*, 98 F.3d at 970. When making a RFC determination, the ALJ must evaluate all limitations stemming from medically determinable impairments and may not dismiss contrary evidence. *Villano v. Astrue*, 556 F.3d 558, 662 (7th Cir. 2009). In this case, the ALJ found it questionable that Mr. Tounsel's drinking is a symptom of his mental health impairments because "his drinking appears to have precipitated [sic] his alleged bipolar disorder by several years." (R. 67). By making this determination, the ALJ played doctor. Bipolar disorder can precipitate substance abuse as a way that the sufferer tries to alleviate his

15

symptoms. *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006). Mr. Tounsel clearly testified that he self-medicates. (R. 15, 21-22). The fact that substance abuse aggravates Mr. Tounsel's illness "does not prove that the mental illness itself is not disabling." *Id.*

Furthermore, the ALJ remarked that the medical evidence demonstrates that Mr. Tounsel "sought assistance more for alcohol-related problems and symptoms rather than maintaining compliance with his medications." (R. 67). However, Mr. Tounsel testified that the financial aid program that paid for his medical visits was discontinued, and he had to try to rely on his family and friends to pay for the visits. (R. 22). The ALJ may not draw any inference against a claimant for lack of treatment where the failure to seek care stems from an inability to pay. *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014). Additionally, "mental illness in general and bipolar disorder in particular may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." *Kangail*, 454 F.3d 630. These are salient factors that the ALJ failed to consider in regard to Mr. Tounsel's course of treatment.

## CONCLUSION

The Plaintiff's motion [19] is granted. The decision of the ALJ is reversed and the case is remanded.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 8/5/15

16